Booth, Chief Justice,
delivered the opinion of the court:
The special jurisdictional act conferring jurisdiction upon this court to adjudicate this Indian case appears in 43 Stat. 886, ch. 214. Reference to this act will be frequently made hereafter and to quote it at present is not necessary.
The magnitude of this involved and complicated controversy is illustrated by the following facts: The special jurisdictional act was approved February 12, 1925. The plaintiffs’ petition was filed August 21, 1926. The audit of the General Accounting Office was filed April 28, 1932. In 1927 the testimony of 155 witnesses was taken and later additional oral testimony was adduced. On August 1, 1932, plaintiffs’ brief was filed, defendant’s brief being filed May 22, 1933. On September 12, 1933, plaintiffs’ reply brief was filed, and the case argued and submitted October 11, 1933,
The record is most voluminous, containing, aside from depositions noted, innumerable documentary and historical data and printed briefs of great proportions. The case itself involves the claims of nineteen Indian tribes or bands and over one hundred items, and is complicated by interlocking and separate controversies exacting minute examination of facts and law applicable thereto.
The plaintiff Indians in 1855 occupied an extensive area of lands west of the Cascade Mountains in what is now the State of Washington. Their tribal organization was broken up into numerous small bands, each possessing a distinct Indian name, and they were generally designated *568 as “ Canoe Indians ”, i.e., they utilized tbe waters of and tributary to Puget Sound in pursuit of fish, and in hunting for bear, beaver, and other fur-bearing animals, traversing a wide range of territory, and transporting their catch to their individual habitat in innumerable canoes.
The Indians as a rule were capable and industrious. They cleared sections of the dense forests for their villages, displayed inventive genius in fashioning needed tools for felling trees and building houses, and cultivated cleared spaces in raising potatoes and other vegetables. The precise acreage extent of lands claimed is not shown, and the boundaries of their individual villages are more or less conjectural. The total population of all the bands now suing probably does not exceed four thousand.
The rich and abundant timberlands of Washington directed emigration thereto as early as 1850, and even prior to this date a sedulous and persistent agitation prevailed to treat with the Indian occupants of the lands, delimit for them a separate reservation, and make available to the white settlers the surplus lands. The Government enlisted the services of Isaac I. Stevens, a distinguished and well-known citizen of the Territory, its Governor and ex-officio Superintendent of Indian Affairs at the time, to negotiate and if possible conclude treaties with the Indian tribes of the Territory looking toward the establishment of reservations and the cession of surplus lands.
What is known as the Medicine Creek Treaty was concluded with the Indians of Medicine Creek on December 26, 1854, ratified by the Senate March 8, 1855, and proclaimed by the President April 10, 1855 (10 Stat. 1132). Nine tribes or bands signed this treaty; two only, the Puyal-lup and Squaxin, are parties plaintiff. Twenty-three tribes or bands signed a treaty at Point Elliott on January 22, 1855. This treaty was not ratified by the Senate until March 8, 1859, over four years later, being finally proclaimed by the President on April 11, 1859. Eleven of said tribes or bands to this treaty are parties plaintiff.
The third and last treaty was signed at Point-no-Point by fourteen tribes or bands on January 26, 1855, ratified *569 March 8, 1859, and proclaimed April 29, 1859; but one of said tribes or bands, i.e., the Skokomisb, is a party plaintiff. These fourteen tribes or bands are what are known and will hereafter be referred to as treaty claimants.
In addition to the treaty claimants the Upper Chehalis, Muckleshoot, Nooksack, Chinook, and San Juan Island Tribes, with whom no treaties were made, prefer a claim predicated upon an unlawful taking of their tribal lands by the Government and the granting of same to white settlers. The total sum sought by both the nontreaty and treaty claimants, as stated in the petition, is $78,365,416.00, reduced in the requested findings to $69,703,466.69. The defendant pleads a counterclaim sufficient in amount, if sustainable, to preclude a judgment for the plaintiffs in any event.
THE OREGON DONATION ACT OF SEPTEMBER 27, 1850 (9 STAT. 496)
Seven treaty tribes or bands contend that prior to the execution of the treaties of 1855 the Government, by the enactment of the Oregon Donation Act, took from them certain areas of tribal lands for which no compensation has been paid. The Oregon Donation Act was a comprehensive measure designed to confer upon white settlers and American half-breed Indians title to lands in the territory described upon certain terms and conditions. A surveyor general was to be appointed and under his supervision the applicants could procure a patent to at least three hundred and not to exceed six hundred and forty acres of land.
The Duwamish, Lummi, Whidby Island Skagit, Samish, Snohomish, Puyallup, and Squaxin Tribes insist that a proven claim exists for payment at the rate of five dollars an acre for 64,965.24 acres patented to applicants under the Oregon Donation Act. It is established that portions of the lands occupied and roamed over by the plaintiff Indians were taken as claimed. The impediment to a recovery is not only confined to an impossibility of ascertaining with any degree of accuracy the extent of the loss suffered by each tribe, but to the additional fact that the boundaries of the tribes are incapable of being definitely or approximately *570 fixed so as to enable the Interior Department to ascertain what if any portion of the patented lands falls within the lands occupied by the respective tribes. Plaintiffs’ counsel predicates this item in suit upon an asserted certainty that a map of the lands occupied by the Indians discloses the extent of the same. While we might definitely dispose of this contention by a finding without comment, the argument advanced is so often repeated, and it is so sedulously insisted that certainty is not exacted in view of the facts and circumstances of'this case, that we cite the facts upon which we rest our findings and conclusion.
The map relied upon, known as exhibit A-3, is not an official or an ancient document; it was not made by surveyors. It was prepared about 1927 from other maps and from oral statements of elderly Indians, all of whom detail what they honestly considered the natural boundaries of their lands. The Interior Department, with these exhibits before it, made the report found in the record, stating “A glance at the map submitted, marked ‘ claimants ’ exhibit A-3 ’, will show the impossibility of determining the boundaries in connection with the public land surveys.” Therefore, it is apparent that the court may not invoke the legal rule that dispenses with evidential certainty in cases where the loss suffered may be ascertained upon a reasonable and logical basis. Unfortunately for the plaintiffs, the unsurveyed condition of their vast territory occupied by their great number of tribes and bands renders it impossible to fix the boundaries of their separate lands except upon oral evidence given many years after the lands had been vacated and under circumstances which preclude the award of a legal judgment for more than two millions of dollars.
A careful and deliberate study of the record exhibits the necessity of basing the claimed loss upon an approximation which would of itself be simply a finding without a basis of fact. This we cannot do. The Supreme Court in Mille Lac Indian case, 229 U.S. 498, 500, said:
“ The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the Government, but merely provides a forum for the adjudication of the claim according to applicable legal principles. Nor does it *571 contemplate that recovery may be founded upon any merely moral obligation, not expressed in pertinent treaties or statutes, or upon any interpretation of either that fails to give effect to their plain import, because of any supposed injustice to the Indians.”
The defendant challenges our jurisdiction to adjudicate any of plaintiffs’ claims which arose prior to the execution of the treaties of 1855. The special act provides (43 Stat. 886) :
“ That all claims of whatsoever nature, both legal and equitable, of the tribes and bands of Indians, or any of them, except the S’Klallams, commonly known as the Clal-lams, with whom were made any of the treaties of Medicine Creek, dated December 26, 1854, Point Elliott, dated January 22, 1855, Point-no-Point, dated January 26, 1855, the Quin-ai-elts, dated May 8,1859, growing out of said treaties, or any of them, and that all claims of whatever nature, both legal and equitable which the Muckelshoot, San Juan Islands Indians; Nook-Sack, Suattle, Chinook, Upper Chehalis, Lower Chehalis, and Humptulip Tribes or Bands of Indians, or any of them (with whom no treaty has been made), may have against the United States shall be submitted to the Court of Claims, with right of appeal by either party to the Supreme Court of the United States for determination and adjudication, both legal and equitable, and jurisdiction is hereby conferred upon the Court of Claims to hear and determine any and all suits brought hereunder and to render final judgment therein * *
The act, except as to nontreaty tribes, is limited to claims growing out of the three treaties mentioned, and omits a provision for a recovery of any sums growing out of acts of Congress. In the case of Price v. United States and Osage Indians, 174 U.S. 373, 375, the Supreme Court said:
“ The right of the plaintiff to recover is a purely statutory right. The jurisdiction of the Court of Claims cannot be enlarged by implication. It matters not what may seem to this court equitable, or what obligation we may deem ought to be assumed by the Government, or the Indian tribe, whose members were guilty of this depredation, we cannot go beyond the language of the statute and impose a liability which the Government has not declared its willingness to assume. It is useless to cite all the authorities, for they are many, upon the proposition. It is an axiom of our jurisprudence. *572 The Government is not liable to suit unless it consents thereto, and its liability in suit cannot be extended beyond the plain language of the statute authorizing it. See, among other cases, Schillinger v. United States, 155 U.S. 163, 166, in which this court said: ‘ The United States cannot be sued in their courts without their consent, and in granting such consent Congress has an absolute discretion to specify the cases and contingencies in which the liability of the Government is submitted to the courts for judicial determination. Beyond the letter of such consent the courts may not go, no matter how beneficial they may deem or in fact might be their possession of a larger jurisdiction over the liabilities of the Government.’ ”
The plaintiffs traverse the jurisdictional contention of the defendant by citing section two of the special act. This language of the section is relied upon, viz:
“ Sec. 2. That the Court of Claims shall advance the cause or causes upon its docket for hearing, and shall have authority to determine and adjudge all rights and claims, both legal and equitable, of said tribes or bands of Indians, or any of them,' and of the United States in the premises, notwithstanding lapse of time or statutes of limitation.”
Obviously this section is procedural; it is not the enaNN-i clause of the act. It waives the limitation statute of six years and prescribes a rule of adjudication for the subject matter referred to in section one of the act. It was not intended as an enlargement of the jurisdiction of the court so as to include claims aside from those specifically mentioned.
LANDS ALLEGED AS TAKEN FROM ALL THE TREATT TRIBES UNDER THE ACT OF MARCH 2, 1853 (10 STAT. 172)
This statute was enacted for the purpose of establishing a “ Territorial Government of Washington.” Section 20 is as follows:
“ That when the lands in said Territory shall be surveyed under the direction of the Government of the United States, preparatory to bringing the same into market or otherwise disposing thereof, sections numbered sixteen and thirty-six in each township in said Territory shall be, and the same are hereby, reserved for the purpose of being applied to common schools in said Territory. And in all cases where *573 said sections sixteen and thirty-six, or either or any of them, shall be occupied by actual settlers prior to survey thereof, the county commissioners of the counties in which said sections so occupied as aforesaid are situated, be, and they are hereby, authorized to locate other lands to an equal amount in sections, or fractional sections, as the case may be, within their respective counties, in lieu of said sections so occupied as aforesaid.”
A judgment for the value of 383,461 acres is sought under this item, the contention being that all said lands were situated within the occupied areas of the fourteen tribes, plaintiffs in this suit, and “ constituted a grant in presentí taking.from the Indians one-eighteenth of all the land in the territory.” What we have said with reference to the alleged takings under the Oregon Donation Act is applicable to this claim. It is utterly impossible from the record to find that 67,067 acres of this land were taken from the Upper Skagit Tribe; this acreage is manifestly obtained by a process of arithmetical computation which is demonstrably devoid of that degree of accuracy sufficient to convince a court sitting as a jury that the lands claimed fell within this tribe’s occupied territory. No possible means exist by which the court may ascertain the landed boundaries of the Indian plaintiffs and award one tribe a judgment which may not do an inexcusable and palpable injustice to another. The fact that Indian tradition recognized natural formations as boundary lines and the Indians manifested a jealous protection of their claimed territorial rights, while available in some instances to fix certain tribal rights, will not warrant a finding of definite takings of land unsurveyed and undescribed, notwithstanding a belief that a portion of the lands taken may have fallen within the areas claimed by the tribes. The oral assent of the Indians as to the accuracy of their boundary lines given unanimously in 1926 and 1927 may not be accepted by the court as irrefutably correct in view of positive rules of evidence which preclude such a procedure. It is no reflection upon their veracity and no challenge to their intelligence when we say that this is a suit in court involving an adjudication of the reciprocal rights of the parties litigant upon principles of settled law. The *574 court is without jurisdiction to award a judgment or judgments upon any other basis. Osage case (supra); Choctaw and Chickasaw Nation v. United States, 75 C.Cls. 494.
ALLEGED TAKINGS UNDER THE ACT OE JULT 17, 1854 (10 STAT. 305)
The above statute provided in part as follows:
“ That, in lieu of the two townships of land granted to the Territory of Oregon by the tenth section of the Act of eighteen hundred and fifty, for universities, there shall be reserved to each of the Territories of Washington and Oregon two townships of land of thirty-sis sections each, to be selected in legal subdivisions, for university purposes, under the direction of the Legislatures of said Territories, respectively.”
The Duwamish and Snoqualmie Tribes contend that 8,643.94 acres of lands occupied by them were taken for university purposes. For the reasons stated above, we think the claim is without merit.
IMPROVEMENTS
Article VII of each of the treaties, Medicine Creek, Point Elliott, and Point-no-Point, contained the following language:
“Any substantial improvements heretofore made by any Indian, and which he shall be compelled to abandon in consequence of this treaty, shall be valued under the direction of the President and payment made accordingly therefor.”
The parties plaintiff, fourteen in number, all of whom were parties to the treaties, ask a judgment for $2,236,334.50, the alleged value of substantial improvements abandoned by them when they removed to their respective reservations delimited in the treaties. The cause of action is predicated upon the Government’s failure to either fix a value upon or pay any sum for the same.
Reliable Indian histories and oral testimony disclose the irrefutable fact that the Indian plaintiffs erected, and a large portion of the time lived in, substantial log houses. These dwellings varied in size and were almost uniformly designed to accommodate from one to five Indian families. *575 This was accomplished by their division into apartments by means of mats. The lodging quarters traversed the lower portion of the buildings, above which were extensive permanent shelves upon which their food and living necessities were stored. The buildings were heated by means of fires in the center thereof, the smoke escaping through an aperture directly above the fire. The center of the buildings, aside from adaptation for heating purposes, served as a lobby or a foyer where the occupants gathered for both social and educational purposes.
Available timber was abundant and the Indians exerting a great amount of personal labor took from the forests large quantities of cedar logs which constituted the main constructional element of their houses. Without a doubt these dwellings involved a vast amount of time and labor and served a distinct and important purpose in the comfortable accommodation of the inhabitants of the numerous Indian villages. That they were abandoned and never paid for is not disputed.
The defendant resists a judgment upon the theory that the claims are individual and the special jurisdictional act precludes consideration of any other than tribal claims. The Bladefeather case, 37 C.Cls. 233, 190 U. S. 368, is cited as sustaining the defense. We think the defense untenable. The ownership of the dwellings may have been in individuals, and while the language of article YII is susceptible to the meaning given it by the defendant, nevertheless it is apparent from the nature of the transaction, the object to be accomplished, and the payment to be made, that the intention of the parties was to convert a possibly individual claim into a tribal one.
The Government was securing a cession of lands improved by the individual efforts and industry of the Indians, and, in addition to the value thereof free from improvements, the clear intention of the parties was to fix a value upon all substantial ones and increase the compensation to the tribe accordingly. It is difficult to believe that the Government intended a detail survey as to value and title of property involved, and to search out the individuals for payment when the negotiations culminating in the treaties were conducted *576 with the tribes, and the primary object was to adjust and settle tribal affairs. The dwellings housed the members of the tribe and the treaty dealt with the tribe as such, and in the absence of more positive provisions to the contrary, we think the claims are tribal.
The plaintiffs present a record rested upon a great volume of oral testimony and supported to some extent by documentary proof as to the number and value of the dwellings abandoned. This record, it is said, has not been traversed by testimony on behalf of the defendant, and hence must be accepted. This enunciation of an inflexible rule as to the probative value of oral testimony is novel in the extreme, when it is apparent from the record that it was impossible for the Government to traverse it by positive statements as to a different number of dwelling houses.
An analysis of plaintiffs’ oral testimony may form a basis for a judgment, but it, like all other oral statements, is subject to contradiction when it is disclosed on cross-examination and upon its own facts to be so decidedly at variance with the established status quo of the tribes as to abound in exaggeration and hearsay. We will not cite authorities to sustain the rule that the interest of witnesses in the outcome of the litigation, and their relationship to the transaction involved, their opportunity for knowing what they state, their intelligence and candor in making statements, are all factors in giving weight to the testimony adduced. Applying these rules, the plaintiffs’ testimony as to the precise number of dwellings is so obviously contrary to the basis given for the existence of the number stated, as well as the accommodation of the Indian population living therein, that it may not be accepted as entirely accurate.
The record furnishes a reasonable basis upon which the court can predicate a finding that an estimated number of dwellings were abandoned. It is shown what the average size of an Indian family was and the average number of families accommodated in each dwelling. Accepting a computation rested upon these figures and the given population of the Indian tribes in 1854, we think finding XI reflects what at least was the minimum loss suffered by the Indians in surrendering their dwellings.
*577 The plaintiffs claim a value of $900 for each dwelling. The claimed value must of necessity be predicated upon the labor of the Indians in erecting the same. The logs with which they were constructed were free of cost, near at hand, and plentiful, so that all that entered into the expense of their building was the labor, and this was supplied upon a communal basis. While the means of felling trees employed by the Indians now seem crude and inefficient, it is a fact that they served the purpose, and in an astonishingly short time the houses were completed. Considering all factors, we believe $250 each is sufficient to cover all expense, and judgment will be awarded as found in finding XI.
The treaty tribes prosecuting this case ask for a large judgment for a failure of the Government to observe the alleged treaty obligation to allot to each of the Indians residing on the reservations delimited by the treaties eighty acres of land out of a general reservation to be established subsequent to the ratification of the treaties.
The liability asserted develops out of a similar article in each treaty, in part as follows:
“ The President may hereafter, when in his opinion the interests of the territory shall require and the welfare of the said Indians be promoted remove them from either or all of the special reservations hereinbefore made to the said general reservation, or such other suitable place within said territory as he may deem fit, on remunerating them for their improvements and the expenses of such removal, or may consolidate them with other friendly tribes or bands; and he may further at his discretion cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, * *
The sixth article of the Omaha Treaty provides in part as follows:
“ The President may from time to time at his discretion cause the whole or such portion of the lands hereby reserved * * * to be surveyed into lots and to assign to *578 such Indian or Indians of said tribe as are willing to avail themselves of the privilege and who will locate on the same as a permanent home, if a single person over twenty-one years of age, one-eighth of a section; to each family of two, one-quarter of a section; to each family of three and not exceeding five, one-half section; and to each family of six and not exceeding ten, one section; and to each family over ten, one-quarter section for every additional five members” (10 Stat. 1043).
The three treaties of 1855, ratified and proclaimed as previously noted, delimited to the tribes mentioned a reservation. As to this fact there can be no doubt, and the language of the article quoted leaves no room for a contention that the question of establishing a general reservation at some future date was not left to the discretion of the President. It was not mandatory. No such reservation was ever established, and with the exception of allotments subsequently made to the Indians out of their final reservations, they never received an allotment of eighty acres of land as herein claimed.
Plaintiffs resort to contemporaneous events and assertions to prove that the representative of the Government assured them, and the Indians understood, that the reservations delimited under the 1855 treaties were but temporary and were to be followed later by permanent allotments of 80 acres each out of a general reservation of sufficient extent to accomplish this purpose, and that the word “ may ” in the article should be construed to mean “ will.”
The meaning and binding force of the treaties, it is said, were interpreted to the Indians by the use of the “ Chinook jargon language ”, a medium of communication composed of a combination of the Indian, French, and English languages, embracing about three hundred words and employed generally by Indian traders, a language the tribes did not understand and the use of which led them into a belief that they were acquiring individual allotments under the treaties.
The numerous Indian tribes and bands involved, as the record shows, possessed no common language. Between them existed the instinctive Indian hostility towards each *579 other, and they were jealous of their autonomy. Preliminary legislation for the negotiation of the treaties, as well as instructions, to the Government’s representative commissioned to conclude them, clearly discloses that the object to be accomplished was the cession of their claimed rights of occupancy to a vast extent of territory to the Government, and the establishment of delimited reservations for them, with the hope that sometime in the future, when conditions warranted, a general reservation would be established and allotments thereon made to them. This procedure and the provisions of the treaties clearly reflect the then prevailing governmental Indian policy to convert the Indian population into agriculturists, bring about peaceable relations between the tribes, and eventually provide them with permanent farms of their own.
Why it was not done is not for the decision of the. court. We are not at liberty to charge it to the Indian wars which prevailed from 1855 to 1857, or to any other cause. The issue is, “ Did the treaty confer upon the Indians title to eighty acres of land in a. general reservation the Government was bound to establish? ” We think not. The court must accept the treaties as they were written, and no charge that they were obtained by misrepresentation or that plaintiffs’ signatures were procured by sharp practice can be entertained.
The treaties did provide for delimited reservations and for the discretionary right of the President to alter the situation when in his judgment it should be done, and make permanent allotments upon the same terms and conditions as were provided in the Omaha Treaty out of a general reservation to be established in the future. This was the extent of the legal obligation assumed by the Government and beyond it we may not go. The precedents are many and explicit. Old Settlers case, 27 C.Cls. 1. In Leighton's case, 29 C.Cls. 288, 321, this court said:
“ Even if the contention of the defendants is correct, the court cannot inquire into it (Doe v. Braden, 16 How. 657). * * * When a treaty has been executed, and ratified by the Senate and proclaimed by the President, courts will pre *580 sume that such treaty was lawfully made. This question was passed upon in the case of Fellows v. Blacksmith (19 How. 366, 372), where it was said:
“ ‘An objection was taken on the argument to the validity of the treaty on the ground that the Tonawanda Band of the Seneca Indians were not represented by the chiefs and headmen of the band in the negotiations and execution of it. But the answer to this is that the treaty, after executed and ratified by the proper authorities of the Government, becomes the supreme law of the land, and the courts can no more go behind it for the purpose of annulling its effect and operation than they can behind an act of Congress.’ ”
Leased District case, 34 C.Cls. 17; The Amiable Isabella, 6 Wheat. 1.
What we have said is not in conflict with the precedents establishing the rule that in the construction of Indian treaties the Indians, because of their political and natural status, are to receive the benefit of the doubt in giving effect to doubtful and ambiguous articles of the same. Minnesota v. Hitchcock, 185 U.S. 402.
In this instance we do not encounter the rule contended for by plaintiffs. Here we have a positive grant and cession, perhaps induced and coupled with a reserved discretionary right to alter the same upon the happening of certain events and conditions. It is not a positive obligation and obviously was not so intended, and the court is without jurisdiction to disregard its terms and read into it a word or words which would change its obligatory character.
ANNUITIES — POINT ELLIOTT TREATY TRIBES
The Duwamish, Lummi, Suquamish, Upper Skagit, Kikiallus, Swinomish, Whidby Island Skagit, Samish, Still-aguamish, Snohomish, and Snoqualmie Tribes, parties to the above treaty, rely upon a nonobservance of article VI of the treaty for a recovery of one-eleventh each of the sum mentioned therein on the grounds that no substantial payments either in money or goods were made to any of said plaintiffs. The amount claimed is $13,636.33 for each of the tribes.
*581 Article VI of the treaty is in this language:
“ In consideration of the above cession, the United States agree to pay to the said tribes and bands the sum of one hundred and fifty thousand dollars, in the following manner — -that is to say: For the first year after the ratification hereof, fifteen thousand dollars; for the next two years, twelve thousand dollars each year; for the next three years, ten thousand dollars each year; for the next four years, seven thousand five hundred dollars each year; for the next five years, six thousand dollars each year; and for the last five years, four thousand two hundred and fifty dollars each year. All which said sums of money shall be applied to the use and benefit of the said Indians, under the direction of the President of the United States, who may from time to time determine at his discretion upon what beneficial objects to expend the same; and the Superintendent of Indian Affairs, or other proper officer, shall each year inform the President of the wishes of said Indians in respect thereto.”
There is a controversy in the record as to the correct number of plaintiffs. The defendant insists that the Whidby Island Skagits and the Upper Skagits constituted one band, the Skagit, and that the Samish Indians were a band of the Liunmi Tribe. The plaintiffs, on the contrary, insist that the Samish Indians were a separate tribe and their signatures appear by the Samish chief signing the treaty under the name “ Noo-wha-ha.” Other chiefs are alleged to have signed for two bands, the remaining ones representing their own tribe. The controversy is difficult to correctly solve. If the plaintiffs are right, whatever recovery may be had is apportioned among eleven out of the total amount due. If the defendant prevails, the apportionment would be one twenty-third of the total sum due divided among nine instead of eleven claimants.
The controversy is not of easy solution. We think in view of the jurisdictional act the correct way to determine the fact is to resort to the treaty, 12 Stat. 921. The preamble of the treaty enumerates twenty-two bands or tribes, while the parties’ signatures indicate a participation of twenty-three. The one defense relied upon is that the full amounts to be paid have been appropriated for and dis *582 bursed in accord with the provisions of the treaty. The report of the General Accounting Office, itemized and exhaustively made, discloses that a total sum of $320,213.86 was disbursed over annual periods from 1861 to 1881. This report allocates to article VI of the treaty the sum of $172,-243.80, which is manifestly in excess of the $150,000 annuities due. $13,340.02 is allocated to article XIII and $134,-630.04 to articles XIV of the treaty.
The plaintiffs contend that the entire sum of $172,243.80 allocated to article VI of the treaty was paid and properly chargeable under article XIV of the treaty, which contains the following provisions:
“ The United States further agree to establish at the general agency for the district of Puget’s Sound, within one year from the ratification hereof, and to support for a period of twenty years, an agricultural and industrial school, to be free to children of the said tribes and bands in common with those of the other tribes of said district, and to provide the said school with a suitable instructor or instructors, and also to provide a smithy and carpenter’s shop, and. furnish them with the necessary tools, and employ a blacksmith, carpenter, and farmer for the like term of twenty years to instruct the Indians in their respective occupations. And the United States finally agree to employ a physician to reside at the said central agency, who shail furnish medicine and advice to their sick, and shall vaccinate them; the expenses of said school, shops, persons employed, and medical attendance to be defrayed by the United States, and not deducted from the annuities.”
This article supplies the Indians with five distinct activities free of expíense — -the school, blacksmith shop and blacksmith, carpenter shop, carpenter and tools, a farmer, and a physician. While the school is to be free to the children of this and such other tribes as may avail themselves of it, the article does not charge the expense of subsistence and clothing to the Government. The complications which exist, and which the defendant concedes to exist and the General Accounting Office experienced, reside in the fact that definite information as to many of the early accounts is absent, and the allocation of the disbursements to specific articles of the treaty is in some instances doubtful.
*583 Article YI applies the annuities to the “benefit of said Indians ” as determined by the President, acting under information to be supplied him by the Superintendent of Indian Affairs. Clearly, the activities, the expense of which the Government assumed liability under -article XIY, were for the benefit of the Indians, so that it is apparent that only those disbursements which inured to the general benefit of the Indians, aside from the specific ones mentioned in article XIV, are to be allocated to article YI.
Agricultural aid, implements and equipment, for which the sum of $16,405.88 was disbursed, are, we think, to be allocated to agricultural and industrial schools under article XIY. The counterclaim exhibits but $84.50 disbursed for implements for the school. The Indians, when the treaties were proclaimed, were not expert farmers; they did cultivate the soil to a limited extent, but the development of a desire for farming as an occupation was foreign to their nature, and the free school was designed to cultivate an ambition of this sort by instructions in the art' of employing modern implements in farming operations.
The sum of $1,146.21, medical attention and supplies, allocated to article YI, is clearly chargeable to article XIV.
A contention is advanced by plaintiffs that agency expenses, including cost and maintenance of building, as well as Indian interpreters, should be classed as administrative costs and not chargeable against the Indians’ annuities. No article of the treaty mentions the same unless they fall within the general classification as beneficial to the Indians under article YI. The policy of establishing agencies to look after tribal affairs, whatever the results, was intended for their benefit. The authority conferred upon the Superintendent of the agency was directed towards a beneficial administration of the tribal estate and the welfare of its inhabitants, protect the Indians against exploitation and loss of property rights from designing traders, and advise the authorities at Washington as to the wisdom or inadvisability of proposed proceedings affecting their interests, and in the absence of a specific provision to the contrary, we think these expenses are properly allocable to article YI of the treaty.
*584 The item of pay of miscellaneous and skilled employees is a most troublesome one, as well as the expense of feeding livestock and supplying tools and materials for mills. It is evident that the annual sums to be disbursed under article YI, while designated annuities, were not to be prorated in cash among the Indians. The necessity for skilled and other employees does not appear. In the absence of definite information upon the subject, and in view of the general intent and purpose of the treaty in establishing an agricultural and industrial school for the purpose of instructing “ the Indians in their respective occupations ”, we are inclined to the opinion that the expense incurred for the employees involved is not chargeable under article VI but under article XIY. Their employment for any other purpose would seem needless, and in addition to school instruction practical education in the field was essential. Tools and material for mills and the feeding and care of livestock we think come under article YI.
Additional items of disbursements under article YI are specifically objected to, but we think that finding XYI correctly allocates the expenditures. Article YI provided for a payment of $150,000 over a period of twenty years. During that period there was disbursed for the benefit of the Indians a total sum of $150,124.94, or $124.94 in excess of treaty stipulations. Article XIII of the treaty provided for the payment of $15,000 to defray the expenses of removal of the Indians to their new reservations; but $13,340.02 of this sum was so expended, leaving a balance due the Indians of $1,535.04, for which amount they are entitled to a judgment.
ANNUITIES-MEDICINE CREEK TREATY TRIBES
The claims of the Medicine Creek Treaty plaintiffs for annuities are similar in all respects to the Point Elliott Treaty claims, and the facts with respect thereto are set forth in finding XVIII of the court from which it appears that, irrespective of misallocation of particular sums to particular purposes under certain articles of the treaty, the United States has appropriated and disbursed a sum more than sufficient to meet its obligations under the treaty.
*585 ALLEGED LOSS OF LANDS BY OVERLAPPING OP RESERVATIONS DELIMITED TO POINT ELLIOTT TREATY TRIBES
The area of land granted to plaintiffs for their reservation totaled 44,191.99 acres. In delimiting under article III of the treaty a reservation of thirty-six sections called the Tulalip or Snohomish Eeservation two sections of land included in the Tulalip Eeservation overlapped the lands set aside in the Point Elliott Treaty, causing a loss of 1,830.09 acres to the tribes. Subsequently, by Executive orders, the treaty reservations were increased to 49,185.65 acres. Thus it is apparent that the Indians gained 5,593.66 acres. The plaintiffs in the reply brief make no objection to the facts as stated. The claim is without merit.
LOSS DUE TO FAILURE TO MAINTAIN FOR THE TREATY TRIBES AN AGRICULTURAL AND INDUSTRIAL SCHOOL UNDER ARTICLE XIV OF THE POINT ELLIOTT TREATY
Article XIY of the treaty has been heretofore quoted. The Government agreed to establish an agricultural and industrial school at the general agency of Puget Sound, and to supply the Indians with a farmer, blacksmith, carpenter, and physician for a period of twenty years. The school was to be free to the tribes and bands in common. The failure of the Government to observe these obligations, except in a most feeble way, is marked and irrefutable. Beyond a doubt it was the intention of the Government at the time the treaties were concluded to ultimately provide a general reservation for all the Indians west of the Cascade Mountains, and while the treaty left the future action of the Government to the discretion of the President, the assumed obligations to maintain a free school as mentioned, and to supply the blacksmith, carpenter, farmer, and physician, index unmistakably that a centralization of the tribes was the final object to be accomplished.
We say this because the Point Elliott Treaty was concluded with a large number of tribes and bands to whom four delimited reservations were set aside, and the educational facilities to be offered them were to be located at the general agency of Puget Sound in order to accommodate not *586 only the children of the Point Elliott tribes and bands but the children of other tribes and bands. Granting the fact to be that in 1859 a small school was established, but not at Puget Sound, it was soon thereafter discontinued and not reopened until 1861, and it was not until 1867 that a semblance of real school was put in operation. Whether this school was an agricultural, industrial, or a general school is not shown. It was conducted by a learned Catholic priest, obviously established through the efforts and interest of a Catholic mission located in the vicinity. There is no reliable evidence in this record that an agricultural and industrial school was established until fifty years after the treaties were made. The annual expense incurred by the Government in conducting the school at intermittent periods provided for under article XIY of the treaty was $2,619.65, or a total expenditure, audited by the General Accounting Office for a period of twenty years, of $52,393.01. Both the facilities offered and the sums expended were decidedly insufficient to accommodate the children of the numerous tribes. Official reports confirm the fact that educational facilities of any sort were lamentably inadequate for the Indians, and never available to all of them. The record is positive and extensive as to these facts.
The plaintiffs claim a large sum in damages, $350,000 to each tribe. The court is confronted with the legal proposition that, given a plain failure to observe the treaty, by what process may it award damages ? The survivors of the failure to obtain educational benefits intended are necessarily few and manifestly too advanced in age to now secure more than a sum of money. The claim is not for them alone but for the living members of the tribe. How may the court, sitting as a jury, appraise the money value of the loss of educational facilities guaranteed to one?
The plaintiffs cite several authorities exemplifying the fundamental rule that when the Government fails in its contractual obligations it becomes liable for damages, and from them insist that the ascertainable costs of conducting schools of a similar character form a correct basis for estimating the extent of the injury. Quoting from Baltimore *587 & Potomac Railroad Co. v. Fifth Baptist Church, 108 U.S. 317, 335, the plaintiffs say the Supreme Court held- “As with a blow on the face, there may be ho arithmetical rule for the estimate of damages. There is, however, an injury, the extent of which the jury may measure.” With the assailant and the assaulted present, coupled- with proof of actual damages by way of loss of time, medical and other expenses; the jury does have a basis for a verdict. The case -cited concerned a suit by a religious corporation against the railroad company for maintaining a nuisance, and the Supreme Court affirmed a verdict against the railroad company, predicated not only upon the depreciation in the value of the property of the plaintiff but upon the physical discomfort the nuisance occasioned and the loss in congregation, all of which tended to destroy the use of the church building for the purposes to which it was dedicated.
We search the record in vain for ány accurate estimate of the. number of persons eligible and willing to attend the schools. In fact, there is some testimony that the parent Indians did not .encourage their children - to • attend. The money value to be placed upon the extent to. which the absence'of schools impeded the civilization and- intellectual-development of the tribes must of necessity rest in conjecture without any substantial basis upon which' to rest it. The real sufferers are the children of the Indians diving in 1859 to 1879; the adults, of this generation now- living "would recoup but a small sum, and the generation who calme after-wards the larger part, when as a matter of' fact the later generation was generously offered the advantages of education. There is no evidence- in the record that the plaintiffs’ sent their children to other schools and thereby incurred expense. No proof is adduced that funds were expended, in building schoolhouses or employing teachers to conduct schools. All the record discloses is as stated. The right which the Indian children lost, deplorable as it may be, was seemingly an intangible one, the right to an education denied them not only by the Government’s failure but by the Indians’ inability to supply it. This right we think is incapable of being estimated in dollars and cents.- •. It is incontro *588 vertible — Indian, history sustains the statement — that in early times the Indian tribes were in no sense partial to schools upon their reservations. Their establishment was a feature of governmental policy, and while in this instance the Government signally failed to observe it, the court is powerless to award a money judgment for such failure, in the complete absence of a substantial basis of fact upon which to predicate it.
OLAIM OP MEDICINE CREEK TREATS' plaintipps for failure to ESTABLISH AND MAINTAIN AGRICULTURAL AND INDUSTRIAL SCHOOLS
Article X of the Medicine Creek Treaty is in precisely the same language as article XIV of the Point Elliott Treaty. The same argument is advanced to sustain the claim as was urged in the case of the Point Elliott Treaty claimants. It is conceded by the Government that no general agency was established for these Indians on Puget Sound. The agency was established upon the Squaxin Reservation and a schoolhouse erected thereon, the school being later removed to the Puyallup Reservation. The two parties plaintiff under the Medicine Creek Treaty are the Puyallup and Squaxin Tribes. This treaty, unlike the Point Elliott and Point-No-Point ones, was ratified March 3,1855, and the school to be established was to accommodate the children of not only the nine tribes signing the treaty but the children of the tribes signing the other two treaties. The total sum expended by the Government for educational purposes under article X of the treaty is $17,528.58. Of this amount $14,539.37 was for teachers’ salaries, an annual average outlay of $726.96 to' provide teachers for the children of these tribes, whose population, aside from additional children to be educated, was approximately 1,400 Indians. Whatever may have been the lamentable cause for the failure of the Government to observe its obligations and encourage education, it is manifest, we think, that nonobservance is completely established. A contradictory record of documentary reports emanating from a disinterested source discloses, on the one hand, an ardent desire upon the part of the Indians *589 for a school adequate in every particular and, upon the other, a disinclination to send their children to school. Nevertheless, as previously observed, it was in keeping with the spirit and intent of the treaty and in harmony with the Indian policy of the Government to maintain schools and encourage education. It was not done, but for reasons stated we are unable to award damages.
CLAIMS OE POINT ELLIOTT AND MEDICINE CREEK TRIBES EOR FAILURE TO EMPLOY BLACKSMITH, CARPENTERS, FARMERS, AND PHYSICIANS
The report of the General Accounting Office discloses a disbursement of $86,135.26 for the employment of the persons mentioned in article X of the Medicine Creek Treaty. For the same purposes the Government disbursed under article XIV of the Point Elliott Treaty $77,097.10, and while the services of the designated persons were not continuous as to either of the treaty tribes, they did continue for many years. The plaintiffs offer no proof establishing the expenditure of any definite sum of money caused by the absence of the above persons; no evidence whatever is offered. The plaintiffs’ contention for a large judgment is rested exclusively upon proof of failure to keep the persons employed continuously, and the inadequacy of what was done to meet the necessities of the Indians in this respect due to a violation of treaty obligations to establish a general reservation for all the Indian tribes and remove them thereto.
It may well .be and doubtless is true that scattered as the tribes were over an extensive territory, the employees mentioned in the articles of the treaties could not serve each one to the full limit of its necessities, and maybe in some instances not at all. The court, however, must take the treaties as written;, we cannot under the jurisdictional act. extend their provisions so as to embrace within their articles alleged injustices which resulted from the written contracts, when the same do not provide for numerous employees but for single persons. The amounts disbursed by the Government for the pay of these employees, i.e., car *590 penters and farmers, were paid during the years 1863, 1864 1880, and for physicians, 1868, 186.4, and 1866 to 1880.
The demonstration of the fact that the court, cannot award a' judgment upon the basis of what it cost the Government to employ the persons involved lies in the fact that the sums expended, as stated by the plaintiffs, served to procure their services for certain- bands and tribes to the exclusion of others, and it is impossible to conclude, in view of the disparity in population, location of the Indians, and their varied necessities for such services, that the cost would have been uniform. The Lummi Indians were supplied a farmer for twenty years, but it does not follow that the other tribes needed the same services at the same cost, in the absence of some proof of their needs, or the expenditure of the funds of the Indians to procure the same.
In accord with article X of the Medicine Creek Treaty, a carpenter and blacksmith were employed for seventeen years, a farmer for eighteen years, and a'physician for sixteen years. Basing a claim upon1 this proof, the plaintiffs contend for a judgment of $3,537 for eaeh of the tribes for failure to furnish a physician' for four years in the face of the fact that article X of the treaty does not obligate the Government to do more than’furnish the named employees at the general agency on Puget Sound; Aside' from the physician, who was to administer generally to the sick, the additional employees were supplementary to the school to be established at the agency. The extent of the injury occasioned the various tribes because of being unable ’ to-avail themselves of the services of these employees during the years they were not furnished, is not shown.
Reduction of futallup reservation — finding xix
Article II of the Medicine Creek Treaty set- aside as the Puyallup Eeservation 1,280 acres of land “lying on the south side of Commencement Bay.” The reservations delimited to the Indians, parties to the Medicine Creek Treaty, were found to be unsuitable as such, and under article VI of the treaty the President on January 20, 1857 (1 Kapp. Treaties 919, 920), by Executive order enlarged the same. *591 The actual addition made to the Puyallup Eeservation was found upon survey to have been less in acreage than intended, and certain lands had been unintentionally excluded.
On September 6, 1873 (1 Kapp. Treaties, 922-923), the President, by Executive order, added to the reservation for the purpose of correcting the previous error all that portion of section 34 not theretofore included within the same. It was the express intention of the Government to delimit for the Indians a reservation so as- to give to them a frontage upon the bay and thereby secure free ingress and egress to the waters of the bay for fishing, and the Executive order of 1873 gave them a mile of water frontage directly north of the Puyallup Eiver. The plaintiffs now contend that a portion of this water frontage equal to 640.75 acres has been taken from them and for the same no compensation has been paid, due entirely to the fault and omissions of the Government to assert title to these shore lands against the State of Washington, the State having platted the same and added them to its tide land property, later permitting individuals and corporations to exercise ownership over them.
The controversy over the ownership of the shore lands, i.e., the acreage between high and low watermark, reached the Federal court, and Judge Hanford sitting in the then Circuit Court for the Western District of Washington, on April 19, 1909, handed down an exhaustive opinion wherein he confirmed the State’s title to the shore lands as against the Indian claimants (170 Fed. 509). The Supreme Court declined to review the decision on the grounds of lack of jurisdiction (220 IT. S. 604). The United States was a party to this suit as guardian and protector of the Indians and was represented by a Special Assistant Attorney General and a special attorney. Seemingly then the United States did all that could be done to protect the Indians in their claim of title to these lands. The decision pointed out the conflict between the grant set forth in the Executive order of the President and the State’s claim of title. Ee-sort having been had to the courts, and legal remedies exhausted, all that remained, so far as the Government was concerned, was congressional action, and obviously that was discretionary.
*592 Significant with regard to this claim is the fact that the Puyallup Reservation contained 18,062 acres and was eventually allotted to 167 Indians to the extent of 17,463 acres, the surplus lands being sold for the benefit of the Indians (27 Stat. 612, 633; 30 Stat. 62, 87; 34 Stat. 325). What we have said includes the entire acreage claimed by plaintiffs.
It is true the jurisdictional act comprehends all claims arising out of treaties, and this particular claim does arise out of the treaty of Medicine Creek, but the claim to be allowable must be a legal or equitable one, and where the subject matter and the respective rights of the parties have been adjudicated we think the court is bound by the judgment and cannot redetermine the controversy under a special jurisdictional act. Mille Lac Indian case, supra.
ALLEGED MISUSE OF PUYALLUP SCHOOL FUNDS
The Puyallup Reservation of 18,062 acres of land proved sufficient in extent after allotments to produce not only surplus lands but individual allotments in excess of the allottees’ necessities for a home. On March 3, 1893 (27 Stat. 612, 633), in the annual Indian appropriation bill chapter 209 was inserted. This chapter authorized the President to appoint three commissioners to appraise and sell all portions of the allottees’ lands not needed for a home, and that portion of the agency tract, exclusive of the Indian burying ground and land, not needed for school purposes.
The act appropriated $20,000, afterwards increased to $35,500, for expenses of the commissioners, and contained a provision that the sums realized from the sale of the agency tract, less the expenses and salaries of the commissioners, were to be placed in the United States Treasury to the credit of the Indians as a permanent school fund to be expended for their benefit. The act also provided for the payment by the United States of interest on the sums deposited in the Treasury at the rate of four per centum per annum.
The plaintiffs’ petition asserts that subsequent to the establishment of the Puyallup Boarding School not only the children of Puyallup Indians but children of other bands *593 and tribes attended and were educated there for the maintenance of which funds derived from the sale of Puyallup agency lands were expended. It is said in plaintiffs’ request for a finding upon this issue that the average attendance of all children during the continuance of the school was 5,018, and the average attendance of children of other tribes was 3,115, leaving an average attendance of Puyallup children of 1,903, and upon this basis the amount expended by the United States and out of the Indian fund should be proportioned. Plaintiffs’ calculation results in a claim for $216,-238.63. In the brief of plaintiffs, filed subsequent to the report of the General Accounting Office, a different conclusion is reached. The issue is one of accounting.
The school fund created under the act of March 3, 1893, totaled $388,095.69. What was afterwards known as the Puyallup Boarding School was established in 1857, located then on the Squaxin Island Reservation; it was in the beginning quite inconsequential. In 1861 thé school was transferred to the Puyallup Reservation and remained in operation until discontinued in 1920. In 1910 the name of the school was changed to the Cushman Boarding School. From July 1,1883, to June 30, 1908, the school was maintained by Government funds exclusively, the expense being $592,778.43, and during this period the average attendance of Puyallup Indian children was 45.46%, the amount chargeable to the Puyallups under this computation being $269,477.07.
From 1908 to 1920, during which time the Puyallups contributed to the maintenance of the school $388,095.69 and the United States $608,343.76, the average attendance of Puyal-lup Indian children was 19.16%. The amount therefore chargeable to the Puyallup school fund is $190,917.80, i.e., 19.16% of $996,439.45. The amount chargeable against the Indians for both periods of time, that is, from 1883 to 1908 and from 1908 to 1920, totals $460,395.53. Of this amount the Indians contributed $388,095.69, leaving a difference in favor of the United States of $72,299.84.
The defendant suggests, without argument, that inasmuch as the average attendance of Puyallup' children over the period from July 1, 1883, to 1920 was 37.75% of the whole *594 attendance, the contributions of the Puyallups failed by $385,605.53 to meet their proportionate part of the expense of maintenance. It is true that during the entire period of the existence of the school the total expense was $1,589,-217.88, and of this amount the Puyallups contributed $388,-095.69, or 24.42%, when their average attendance was 37.75%.
We think, however, that it is inequitable to charge the Puyallups on the basis of the average attendance of children over the entire period, i.e., from 1883 to 1920. From 1883 to 1908 the cost of the school to the United States was $592,778.43 and during this period when the Puyallups possessed no funds to contribute towards the upkeep of the school, and at a time previous to the sale of their lands to create a school fund, they should only be charged with a sum proportionate to the benefits received on the basis of the daily attendance of their children. This sum the plaintiffs seem to concede, i.e., $269,477.07. From 1883 to 1908 the attendance of Puyallup children attained its maximum and during this twenty-five-year period the contributions of the United States were much less than they were for the remaining twelve years, and to carry back to this period the average daily attendance of the Puyallup children and charge them accordingly is, we think, in keeping with the intention of the act which subsequently imposed upon the Indians a liability to contribute towards the maintenance of the school.
From 1908 to 1920, when the Indian fund became available, the Puyallup attendance decreased materially and the maintenance expense increased correspondingly. Apparently the school grew in importance; its facilities expanded, and the opportunities offered both the plaintiffs’ and foreign Indian children were much enlarged. To add to the plaintiffs’ proportionate share of this increased expense their proportionate share of the expense incurred, during a period when conditions were in no sense alike, is, we think, both inequitable and not in accord with the act which imposed the liability. Therefore, the total sum chargeable against the Indians upon this issue is $72,299.84. See finding XX.
*595 FAILURE TO ESTABLISH AND MAINTAIN AN AGRICULTURAL AND INDUSTRIAL SCHOOL UNDER ARTICLE XI OF FOINT-NO-POINT TREATY
The argument advanced to sustain this claim is the same as that urged to sustain a similar claim under the Point Elliott and Medicine Creek Treaties. Finding XXIV discloses the situation from the standpoint of facts, and what we have previously said as to the same issue applies here.
DISPOSAL OF PUYALLUP INDIAN SCHOOL EQUIPMENT
After the discontinuance of the above school certain equipment and property used in the operation of the school were disposed of by order of the Commissioner of Indian Affairs. Many items of personalty were invoiced to the Tulalip and Salem Indian schools. The plaintiffs contend for a judgment for the entire amount stated in the invoices. The defendant contends that the articles purchased from funds appropriated by the United States should be excluded from allowance, leaving due the Indians the sums expended from their tribal funds in equipping the school.
The controversy, like the preceding one, is a matter of accounting. The defendant designates the funds of the United States used to purchase equipment as “ gratuity funds.” Why they are to be considered as gratuity funds is not clear. The money arose from appropriations by Congress and was spent in precisely the same way and for the same purpose; $996,439.45 was expended in maintaining the school from 1908 to 1920. During this same period of time the Indians expended for the same purpose $388,095.69, and have been charged with their proportionate part of maintenance expense. Just why either party insists upon allowances as set forth in the briefs is decidedly obscure.
We think the plaintiffs are entitled to a judgment on this item for the sum of $5,461.41. The property involved was acquired from 1908 to 1920 and funds of the Indians in the proportion heretofore stated were expended in its acquisition. The money due for its salvage value should be.dis *596 tribute! on the same basis, i.e., 19.16% of $38,346.63 is $6,389.21, less-previous payment of $921.80, leaving a balance due the Indians as stated. For this amount the Indians are entitled to a judgment. This we think is accurate because the Indians receive credit for the overpayment made by them from 1908 to 1920 upon the underpayments made from 1883 to 1908.
CLAIM OK THE SKOKOMISH TRIBE UNDER POINT-NO-POINT TREATT — ANNUITIES
Article V of the Point-no-Point Treaty is in precisely the same language as article VI of the Point Elliott Treaty except as to the amount of the consideration to be paid the Indians for the cession of their lands. The Point-no-Point Treaty stipulated for the payment to the Indians of the total sum of $60,000, to- be paid in fixed annual installments over a period of twenty years. The installments to- be paid were to be “ applied to the use and benefit of the said Indians under the direction of the President of the United States.”
We have heretofore discussed on page 37 of this opinion the issue of annuities claimed as due under the Point Eliott Treaty, and the contentions now made by plaintiff are similar in all respects to those heretofore made.
The records of the General Accounting Office disclose a total disbursement under the various articles of the Point-no-Point Treaty of $198,945.54, extending over a period from 1861 to 1881, and while some of the items allocated to certain articles of the treaty, as we have previously found, should have been allocated to other articles, nevertheless the sums disbursed clearly exceed the sums due under the treaty, and the annuity claim must fail. See finding XXIV.
The oral testimony of many witnesses, -declaring that as to them they received no annuities, was taken in 1926 and 1927, some five or six years previous to the coming in of the report of the General Accounting Office. It is doubtless true that certain tribes and bands received small, if any, allocation of supplies intended to be furnished under the treaties. This was due in some measure to their locations and the difficulties incident to their distribution. However, *597 the fact that certain individuals did not benefit from the distribution and other tribes and bands were discriminated against is not, standing alone, sufficient to enable the court to find either the extent of their loss or the proportion of supplies they would have been entitled to receive.
The treaty did not specify any definite amount for each tribe and band, and the difference in population renders it impossible to allocate the same. The report of the General Accounting Office, replete in detail, discloses the sums disbursed and the items to which allocated. The plaintiffs do not and may not challenge the fact that the sums were appropriated by Congress and disbursed. The challenge to their accuracy goes only to their proper allocation, and the present record, as well as the record searched by the General Accounting Office, discloses in some instances a lack of information as to their allocation. Nevertheless, in the great majority of instances the report of the General Accounting Office is reliable. We cannot disregard it when as a matter of law the appropriations were made by Congress and disbursed through the established agencies of the Government.
CLAIMS OE NONTREATT TRIBES
Five tribes, the Upper Chehalis, the Muckleshoot, the Nooksack, the Chinook, and the San Juan Island Indians, living in or adjoining the territory involved in this case, have never entered into a treaty with the United States. The defendant interposes a defense as to their claims, stated in the brief as follows:
“ * * * the Government never having recognized that these tribes were the possessors of title in any degree to the land now claimed by them, they have no right thereto which can be litigated in this or any other court; that whether or not an Indian tribe has title to any particular section is dependent in the first instance upon sovereign recognition and that until that recognition has been accorded by the sovereign the entire matter rests in the realm of politics and is not determinable in a court of law or equity.”
The issue thus presented, so far as cited precedents are available, has not heretofore been presented to the court. It is, we think, an important one, not to be ignored. The five *598 tribes mentioned were not included in treaties because of dissatisfaction with proffered terms, and continued to reside upon certain lands and certain ones did receive contributions of funds from the Government. Their claim now is that a vast extent of territory to which they claimed Indian title has been allotted and disposed of to white settlers by the United States, contrary to the Indians’ wishes, to their injury and loss of a large sum of money.
A review of the very early decisions of the Supreme Court, consistently followed, establishes beyond doubt the plenary and exclusive authority of the Government over Indian tribal lands and funds. The political department of the Government conceded to the Indian tribes a qualified land title to the lands over which they roamed and upon which they lived, predicated upon the right of occupancy The tribal Indians could not dispose of the lands nor profit beyond their tribal necessities from their resources. The Government alone possessed the authority to ultimately direct the course of their disposal. This was accomplished at first in the familiar way of concluding treaties with what the Supreme Court designated as “ dependent nations ”, and these instruments contained specific cessions of all the Indians’ described and undescribed lands claimed by occupancy, and set aside to them described and ascertained territory for their reservations. Johnson v. McIntosh, 8 Wheat. 543.
This Governmental policy of recognizing tribal rights and providing delimited lands for former nomadic and frequently hostile tribes, in an endeavor to promote peace and advance them in the pursuits of the whites, continued until 1871. The Indians as a tribe were vested with no right to sue the United States for the taking of their lands, until subsequent to the conclusion of treaties which fixed their landed domain, and only then by special jurisdictional acts of Congress in cases where allegations prevailed that treaty stipulations had not been observed, or acts of Congress had deprived them of lands included in their reservations. No case has been cited, and a diligent research reveals none, where tribal Indians have been recognized as sui juris en *599 titled to sue in the courts of the United States for the taking of lands claimed merely by the right of occupancy. It may not be contended that the right of the United States with respect to Indian tribal lands and funds is not supreme. “ No private individual ”, as said in the case of Buttz v. Northern, Pacific Railroad Co., 119 U.S. 55, 66, “ could invade it, and the manner, time, and conditions of its extin-guishment were matters solely for the consideration of the Government, and are not oyen to contestation in the judicial tribunals.” (Italics ours.)
President Eoosevelt, in a special message to Congress, transmitted May 10, 1934, Executive Document 119, I3d Congress, 2d session, vetoing a special jurisdictional act conferring on this court jurisdiction of an Indian case, the Turtle Mountain Band of Chippewa Indians of North Dakota, said:
“ Section 4 of the bill opens the doors of the court to the institution of suits for individual losses or claims, something which the Congress has heretofore sedulously refused to do. This section also empowers the court to entertain questions with reference to agreements and treaties which the courts have uniformly held are strictly political and not within the province of a court. Becognition of Indian title is a purely political matter and can be accorded solely by the sovereign. Section 4 of this act might fasten upon the United State’s liability for the payment of the value of land which they had never recognized as belonging to these particular Indians solely because some official of the United States, minor or otherwise, had ‘ recognized5 title and occupancy by long possession as being in these particular Indians.”
The case of Conley v. Ballinger, 216 U.S. 84, so holds.
Tribal Indians claimed by right of occupancy such vast and unlimited areas of lands, encompassing in many instances the greater and better portions of what are now States of the Union, that had it ever been the political policy of the Government to accord them the same proprietary right that attaches to a title superior to that of occupancy, and open the courts to suits as and for their taking when thrown open to public settlement by the United States, Congress and the courts would have left open no doubts upon the subject.
*600 Indian special jurisdictional acts, of which there are many, exemplify the established rule that resort to the courts by tribal Indians has always been restricted to adjudication of treaty rights and losses suffered by acts of Congress with respect thereto. The cases are too numerous to cite. As said in Lone Wolf v. Hitchcock, 187 U.S. 553, 568:
“ In effect, the action of Congress now complained of was but an exercise of such power, a mere change in the form of investment of Indian tribal property, the property of those who, as we have held, were in substantial effect the wards of the Government. We must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the Government exercised its best judgment in the premises. In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress and not to the courts. The legislation in question was constitutional, and the demurrer to the bill was therefore rightly sustained.”
See also Beecher v. Wetherby, 95 U.S. 517; United States v. Rogers, 4 How. 567.
We are of the opinion that this court is without jurisdiction in a case between tribal Indians and the United States for the recovery of the alleged value of lands thrown open to public settlement by an act of Congress, in the absence of a treaty or an act of Congress recognizing the Indians’ title by right of occupancy to the same. The special jurisdictional acts do not confer such jurisdiction (Mille Lac Indian case, supra), and the issue is a political and not a judicial one.
In addition to what has been said, the history and status of the tribes seemingly negative a right of recovery for lack of proof. The claim of the Upper Chehalis Tribe is for 614,400 acres of land at five dollars per acre. This acreage, it is said, is proven by a return of the Interior Department made in pursuance of a call from the court, based not upon an original document in the Indian Bureau *601 but in accord with a map supplied by the plaintiffs. No accurate record is offered as to the precise extent of territory inhabited by this and affiliated tribes, and this is due to the following state of facts:
It is always difficult, if not impossible, to delimit the acreage of lands claimed by tribal Indians by right of occupancy. There were various bands of Indians living upon the Chehalis River and its tributaries and on Grays Harbor in southwestern Washington. They were known as the Chehalis Tribe and included at least members of the Satsop, Humptulip, and other tribes, divided into what was known as Upper and Lower Chehalis Tribes, the Satsop River being the dividing line.
An effort was made in 1855 to conclude a treaty with all these Indians. It proved abortive because of a wish to have delimited for them a reservation which had been set aside to other Indians in the treaties of Medicine Creek and Point-no-Point. In 1859 the Superintendent of Indian Affairs for Washington Territory set apart a certain tract of land for a reservation for the Upper Chehalis and Cowlitz Tribes at the mouth of Black River. In 1862 this reservation was by mutual agreement reduced, to about six sections of land, and a recommendation was forwarded to Washington for an affirmance of this agreement, and the Secretary of the Interior on July 8, 1864, approved the same. In Kappler’s Indian Treaties, vol. 1, page 241, the details of this transaction are officially set forth. After a recitation of the claims of the Indians to their lands by right of occupancy and the manner of treatment accorded them, the Commissioner reports:
“ After various propositions made to them by Superintendent Hale, looking to their removal and joint occupation of other Indian reservations, to all which they strenuously objected, they expressed a willingness to relinquish all the lands hitherto claimed by them, provided they shall not be removed, and provided that a sufficient quantity of land shall be retained by them at the mouth of the Black River as a reservation.
“ The selection herein made in accordance with their wishes, and approved'by Superintendent Hale, reduces the dimensions of their former claim to about six sections of *602 land, with which they are satisfied, and which selection has been submitted to this office for its approval. There seems one drawback only to this selection, and that is one private land claim — that of D. Mounts — which it is proposed to purchase. The price asked is $3,500, which he considers not unreasonable. (See his communication of March 30, 1863, and accompanying papers.)”
The reservation established consisted of 4,224.63 acres of land. The troublesome acreage of Mounts was to be purchased, and on October 1, 1886, President Cleveland, by an Executive order, restored 3,753.63 acres of the same to the public domain for Indian homestead entry and 471 acres were set aside for a school, and thereafter thirty-six of the Indians upon the reservation made homestead selections of all the lands except the school reservations. From July 1, 1857, to June 30, 1929, the Government appropriated for them the total sum of $209,166.92, which included $3,500 paid to Mounts for land within the reservation.
What the Chehalis Tribe complained of was the lack of a definite reservation to their liking and their removal to a location distasteful to them. When the events above detailed finally culminated in a settled arrangement the discontent disappeared. We cite these facts as disclosing the absence of any governmental recognition of Indian title to ascertainable territory claimed by them by right of occupancy, and no claim is now preferred of a divestment of title to reservation lands by the defendant. The plaintiffs state that no reservation was set aside for these Indians; and “ that acting under the friendly advice of an agent, thirty-three Indians took up homesteads on their tribal domain.” If this is the situation and the tribes in the past and up to the present have failed to receive political recognition from the Government and their right to any limited area of lands remains unrecognized, they remain in that status, for the correction of whatever inequalities or injustices prevail is for the determination of Congress and not the courts. To the extent of granting homesteads to the Indians the Government has exercised its political prerogatives; beyond this Congress has not gone, and we are convinced that no mone *603 tary liability exists because of an absence of sucli legislation. • While we may well suppose that the Government would not intentionally take from Indian tribes their claimed tribal lands without compensation, established precedents hold that the authority to do so exists and until Congress grants lands to the Indians, either in treaties or acts of Congress and afterwards takes them, a special act worded as in the instant case confers upon this court no jurisdiction to award a judgment as herein claimed.
THE MUOKLESHOOT TRIBE
The petition in stating the grounds of recovery for this tribe defines an area of land embracing approximately 491,-520 acres, increased in the requested findings to 608,000 acres, lying in what are now King and Pierce Counties, Washington. Wth this tribe no treaty was made, and the judgment asked amounts to $3,047,000. In addition to a valuation of $5 per acre for the land, $7,000 is asked for improvements placed thereon.
In 1856, following a period of hostility upon the part of the Indians, a council with them was held at Fox Island Reservation. The representatives of the Government, in order to allay discontent and do justice, offered to change and enlarge the treaty reservations of the Nisqually, Puyallup, and Snohomish Tribes. This was to be accomplished under article VI of the treaty which authorized the President to change the established reservations wherein his opinion the welfare of the Indians required it.
On January 19, 1857, the Commissioner of Indian Affairs recommended the approval of the enlargement of the reservations and the purchase of private land claims within the same. There was to be an enlargement of the Puyallup Reservation, a change in location and enlargement of the Nisqually Reserve, and “the establishment of a new location, Muckleshoot Prairie ”, a former military station which was to be abandoned. President Pierce on January 20,1857, approved the report (1 Kapp. Treaties, 919). On April 9, 1874, President Grant by Executive order delimited a de *604 scribed acreage and “ set apart ” the same “ as the Muckle-shoot Indian Eeservation, for the exclusive use of the Indians in that locality, the same being supplemental to the action of the Department approved by the President January 20, 1857.”
Without proceeding further in tedious detail with respect to the Muckleshoot Indian Eeservation it is, we think, clear that the proceedings taken to locate the Indians upon the three reservations mentioned were taken in view of the articles of the treaty which authorized the same. No act of Congress established the reserves, and the Executive orders were in keeping with the wording and intent of the treaty of 1855.
It is true the Executive order employs the term “ Muckle-shoot Eeserve ”, but it is extremely doubtful if in so doing the President intended more than a designation of the location of the lands rather than the name of a tribe or band of Indians, and inasmuch as the reservations established emanated from the articles of the treaty of 1855, and that treaty contained a cession of all lands claimed by right of occupancy, this item in suit must be dismissed. In any event, the occupancy by the Muckleshoot Tribe of the reservation set apart by the Executive orders mentioned, which consisted of 3,532.72 acres, was accepted by the Indians living thereon and eventually allotted to them. From contemporaneous records, official in character, it indusputably appears that several tribes of Indians other than the so-called “ Muckleshoots ” inhabited what was known as the Muckle-shoot Eeservation, and that all of those placed upon the same were parties to the treaty of 1855.
Difficult as it has been to trace the genealogy of the Muckleshoots, it is from the record quite clear that at no time has the Government recognized its claimed right of occupancy to the vast acreage claimed. The Indian tribes and bands in this very region were segregated into- small entities, their villages were scattered, and the domain over which they roamed shared by too many others to warrant the court in awarding a large money judgment in the absence of positive proof to sustain such a claim.
*605 THE NOOKSACK TRIBE
The petition as to this tribe describes an area oí land located in what is now Whatcom and a portion of Skagit County, Washington. The claim is for approximately 498,-080 acres of land alleged to have been occupied by the tribe, and the amount claimed as for a taking thereof is $3,735,600.
The defendant insists that the Nooksack Indians were a subordinate band of the Lummi Tribe, and therefore were parties to the Point Elliott Treaty of 1855. If this fact is established they therein ceded to the United States all right, title, and interest in all their lands, except as to treaty reservations. The plaintiffs contest this fact and state that while it is true that some members of the Nook-sack Tribe were present when the Point Elliott Treaty was signed, they were not the authorized representatives of the tribe and were without authority to bind it.
It is admitted that the lands now claimed for by the Nook-sack Tribe are within the boundaries ceded to the United States by the Indian parties to the Point Elliott Treaty. To escape the consequences of this admission the plaintiffs contend that the two chiefs of all the bands authorized to speak for them were not present when the treaty was concluded and did not sign the same.
The documentary and historical evidence available is quite contradictory. There is no doubt that the Nooksack Tribe lived within the territory of the now State of Washington upon an area of land extending from Mt. Baker, in what is now Whatcom County, to the international boundary line. They were essentially mountain Indians, lived by the chase, and the contacts of Government officials with them disclose their aversion to inhabiting other than the mountain lands. There is no doubt that to the north.of them other Indians had.their habitat.
It is to be noted that no delimited reservation was ever set aside for these Indians; at least the plaintiffs^ petition so states. There is no doubt that after the execution of the Point Elliott Treaty they were placed under the charge of an Indian agent, and after the ratification of the treaty *606 came under the charge of the Indian agent for the Lummi Reservation, and participated in the distribution of benefits set forth in the treaty. The report of the Commissioner of Indian Affairs for the year 1877, page 198, states:
“ The reservations provided for in the treaty [Point Elliott Treaty] were located in the vicinity of the most numerous and powerful tribes * * *. The Nugh-lemmy (Lummi) Tribe with its subordinate tribes, viz, Nugh-sahk [Nooksack], Sab-sh, No-ah-ha, and Swalash were assigned to the Lummi Reservation * *
We cite and discuss these details, abbreviated it is true, in order to disclose the obstacle in the way of definitely determining the exact status of the Indians and the relationship between them and the Government. In this instance we have a controversy of fact, the plaintiffs’ insistence predicated upon what is obviously a failure of the Government to recognize the tribe’s title by occupancy to a vast landed domain, and on behalf of the Government a contention that their history indicates beyond doubt that they were a part of the Lummi Tribe and hence concluded as to claims for occupied lands by the cession of the same in the articles of the Point Elliott Treaty.
The Nooksacks were never a large tribe; they were as a rule peaceable and industrious, they cultivated the soil to some extent, and preferred the chase to fishing or exploiting the adjoining bays and streams as most of the so-called “ Sound ” Indians did. Why no treaty was made with them is not important in this case. Whatever may have been their original status, the Government’s relationship with them appears as stated, and unfortunately for the tribe no governmental recognition of its claimed rights to occupancy of lands appears, and judgment may not be awarded.
In this connection it is apropos to state that the recognition by the Government of Indian title by occupancy is not established by proof of the innumerable contacts of the tribes with Indian agents in the administration of Indian affairs. The general policy of the Government, indexed in its gratuity appropriations, is not of itself a congressional action conferring upon the tribes a proprietary right in their occupied lands which may be asserted against the *607 Government’s alleged invasion, in the absence of a law granting the privilege.
A large acreage of land over which these various Indian tribes roamed and which has been in many instances segregated and generally described by Indian officials, historians, and others as their habitat, has been by acts of Congress thrown open to white settlers as a part of the public domain, and no payment made to the Indians therefor. As we have previously said, these great Indian domains have been acquired by the Government in times past by the conclusion of treaties wherein the consideration for the cession is expressly stated. At no time have the tribal Indians ever been free to challenge in a court the right of the Government to dispose of their occupied lands upon a basis of the rights guaranteed in the Constitution of the United States prohibiting the Government from taking the private property of its citizens for a public purpose without paying just compensation therefor.
The plaintiffs cite the act of June 5, 1850 (9 Stat. 487), wherein the President was authorized to appoint Commissioners to negotiate treaties with the Indian tribes of Washington and Oregon for the extinguishment of their claims to land west of the Cascade Mountains and making an appropriation of $25,000 to carry the same into execution. This act is of course an authorization to do what is provided therein, but the authority to act and the accomplishment of the purposes of the act are different.
Congress in enacting the statute was endeavoring to acquire by negotiation and compensation all the rights the Indians claimed in their lands. The treaties were the preliminary step; they depended for validity upon future ratification by the Senate, and while of course the Government knew the Indians were inhabitants of the lands, this legislation did not in any sense impose upon the Government a legal liability or interfere with whatever future policy the Government might choose to adopt in the event the conclusion of treaties failed. The legislation was designed in consonance with the Government’s policy to deal justly with the Indians. It was not a surrender of its sovereign rights in the premises, but an observance of its established political *608 policy to consummate by agreement what might have been done by legislation. The Indians’ right of occupancy has always been a cardinal principle of congressional legislation.
What we mean is that the extent and value of the right are not to be determined by the courts until Congress by legislation speaks.
THE CHINOOK TRIBE AND BANDS OP INDIANS
The petition as to this tribe sets out by description a large tract of land bordering on the north of the Columbia River, embracing an acreage of approximately 714,240 acres, and for an alleged taking of this land the plaintiffs ask a judgment for $3,571,200. A motion to amend the petition, which is allowable under the rules of court, increases the acreage claimed to 822,000 and the amount claimed correspondingly.’
A review of the Government’s dealings with this tribe conclusively shows the claim to be without merit. The Superintendent of Indian Affairs for Oregon in 1851 negotiated thirteen treaties with all the Indian tribes then domiciled along the Columbia River, among them bands of the Chinook Tribe. These treaties were never ratified by the Senate.
One band of the Chinook Tribe, i.e., the Waukikum or Wahkiakum, signed a treaty on August 8, 1851, and therein ceded to the United States all the lands claimed by said band in consideration of the payment to them of $7,000 in ten annual installments. On August 9, 1851, the Wheelappa or Willopah Band of Chinooks in consideration of the payment of an annuity of $500 for ten years, ceded to the United States in a signed treaty all the lands claimed by them in this territory.
On the same day, i.e., August 9, 1851, the Lower Band of Chinook Indians signed a treaty ceding to the United States all the lands claimed by it for an annuity of $2,000 for a period of ten years. Later on, September 22, 1866 (1 Kapp. 924), a reservation of 335 acres was established by Executive order for the remnants of the Chinook bands and the Lower Chehalis Indians.
*609 On August 24, 1912 (Ch. 388, Sec. 19, 37 Stat. 518, 535), an act of Congress was approved which we think it essential to quote:
“Thattherebepaidtothe _ * * * of Waukikum Band of Chinook Indians of Washington the sum of seven thous- and dollars, to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may appear; that there be paid to the Wheelappa Band of Chinook Indians of Washington the sum of five thousand_ dollars, to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may. appear; and that there be paid to the Lower Band of Chinook Indians of Washington the sum of twenty thousand dollars to be apportioned among those now living and the lineal descendants of those who may be dead, by the Secretary of the Interior, as their respective rights may appear, and for this purpose there be, and is hereby, appropriated, out of any money in the Treasury not otherwise appropriated, the sum of sixty-six thousand dollars: Provided, That said Indians shall accept said sum, or their respective portions thereof, in full satisfaction of all demands or claims against the United States for the lands described in the agreements or unratified treaties between the United States and said Indians dated, respectively, * * * August eighth, eighteen hundred and fifty-one; August ninth, eighteen hundred and fifty-one; and August ninth, eighteen hundred and fifty-one: Provided fwrther, That if, after investigation by the Secretary, he shall find that all of the Indians of either of said tribes or bands and their lineal descendants are dead, then none of the money hereby appropriated for such tribe or band shall be paid to any person for any purpose: Provided fwrther, That the Secretary of the Interior shall find and investigate what attorney or attorneys, if any, have rendered services for or on behalf of said Indians, and shall fix a reasonable compensation to be paid said attorney or attorneys for their services in prosecuting the claims of said Indians hereunder, which compensation, if any, shall be paid out of the sum hereby appropriated in full payment of services rendered; and the decision of the Secretary of the Interior with respect to the attorneys and their compensation shall be final and conclusive * *
The attorneys’ fees paid out of the above appropriation totaled $12,900, and to the Indians there was paid $49,741.28, *610 with. $3,358.12 being returned to the Treasury. The Lower Chinooks received $14,837.36, the Wheelappa Band $3,833.33, and the Waubikum Band $5,600.
The facts recited are similar in import to those which caused the veto of the special jurisdictional act in behalf of the Turtle Mountain Band or Bands of Chippewa Indians of North Dakota, heretofore cited.
THE SAN JUAN ISLANDS TRIBE
The San Juan Island Indians claim a loss by governmental invasion of an area of land of approximately 113,920 acres, for which a judgment of $2,278,400 is asked. The controversy involving these Indians signally illustrates the inherent difficulty of resolving it definitely and accurately from a standpoint of fact. The defendant sets out documentary evidence that the San Juan Indians were a subordinate band of the Lummi and Samish Indian tribes, and as such bound by the treaty of Point Elliott to which the Lummi Tribe agreed. If this fact is established, the claim of the San Juans is determined by the articles of that treaty and their tribal lands were ceded to the United States.
The plaintiffs, on the other hand, resort to both documentary and oral testimony to contradict the defendant’s contention, and claim that the San Juans inhabited and occupied all of the islands and lands of San Juan County, Washington.
The decision of the issue of fact is, if we are correct as to the status of the nontreaty Indians, unimportant. However, if we are not correct, the record does disclose such a preponderant doubt as to tribal status of these Indians that we would be unable to find that they constituted what was known as a separate and distinct Indian tribe, but acquired a name due more to location of their villages upon the San Juan Islands, in association with other tribes of the same locality, and it is not disputed that the San Juan Islands were within the territory ceded to the United States in the Point Elliott Treaty of 1855. We think the claim is without merit.
*611 COUNTERCLAIMS OE THE UNITED STATES
The jurisdictional act provides expressly for set-offs or counterclaims, including gratuities. Congress was unwilling to afford the plaintiffs a right to assert legal and equitable claims against the United States arising out of treaties, without asserting a corresponding right to set off against liabilities all legal and equitable defenses.
This court had occasion in the Blackfeet Indian case, No. E-427, decided December 4, 1933,1 to discuss in extenso the issue of legal and equitable set-offs and counterclaims emanating from a special jurisdictional act worded precisely in this respect as the act in this case. In that case the court in discussing the issue, among other things, said:
“ In this case the special act authorizes ‘ set-offs, or counterclaims, including gratuities? No such language appears in the Fort Berthold act, and we are of the opinion that in this case it was the intent and purpose of Congress to charge the plaintiffs with all sums disbursed for their benefit over and above those provided for in treaty or other obligations.”
The plaintiffs’ objections to the allowance of counterclaims are predicated mostly upon a contention that all sums charged to administrative expenses should be eliminated, and that the segregation of the plaintiffs from other Indians united under a single agency, is not possible upon the basis of a pro rata expenditure for all of the same. It is said by plaintiffs that large sums appropriated for the Indians were consumed in the payment of salaries and agency expenses, and little, if any amounts, left for the individual members of the tribes.
The report of the General Accounting Office discloses detail expenditures and the purposes for which the money was disbursed. It is true that there is room for doubt as to the allocation of certain funds to certain articles of the treaties, and if the disparity between the sums to which the Indians are entitled and the sums disbursed approached a point where doubtful allocations would result benefically to the Indians, the plaintiffs’ objections would be exceedingly forcible. However, with the exceptions noted in the findings, the appropriations for and the disbursements made by *612 the United States so greatly exceed the possibility of an injustice to the Indians in this respect that we feel the objections of the plaintiffs are untenable.
With numerous tribes and bands, some residing on treaty reservations and others on nontreaty lands, at one time attached to one Indian agency and at other times to another and different one, we know of no other way to apportion the benefits to all the Indians except upon a pro rata basis, predicated upon percentages of population. Congress made the appropriations; this fact is not open to dispute. The reports of the Indian agents and the files of the Interior Department were all available to the General Accounting Office, and in the face of this documentary evidence, in nowise contradicted except by oral statements of individual Indians that they did not receive what the treaties said they should receive, the court is bound to give effect to the complete audit of the affairs of the Indians from 1855 to date. True, we are not bound as to the proper allocation of the appropriations to certain articles of the treaties, but as to the amount appropriated and disbursed we accept it as accurate.
It is impossible to discuss in detail the multitude of controversial issues of fact involved in this complicated case. We have endeavored to disclose the facts in the findings. The one controversy of signal importance and upon which the issue of a very substantial judgment depends, is centered in the contention that the treaties of 1855 vested in the Indians, parties thereto, a right to an allotment of eighty acres of land in an enlarged and general reservation to be established for them. While of course other issues of importance are directly involved, they are more or less matters of accounting. The three involving legal questions are the grants of land to white settlers preceding the treaties, the construction and effect of the treaties, and the right of the nontreaty claimants to sue.
The deductions pleaded on account of judgments awarded by this court under the Indian Depredations Act (26 Stat. 851) arise because the act prior to amendment made them payable out of tribal funds if available, and if not to be paid by direct appropriation by Congress. The act of July 28, 1892 (27 Stat. 282, 319), amended the foregoing statute, and judg *613 ments in Indian depredation cases should be paid from tribal funds in accordance with the discretion of the Secretary of the Interior.
The Secretary of the Interior did not deduct from Pu-yallup Indian funds any amount for judgments awarded against the tribe. Whether the tribe possessed tribal funds in addition to sums due under treaty stipulations is not shown. All that appears is that no deductions for the judgments found were made by the Secretary from the annuities due the Indians under the treaty of 1855. We include the same in defendant’s counterclaim under the theory that in the absence of some affirmative record from the Interior Department', some direct action with respect thereto, the act of our jurisdiction comprehends them as set-offs. The language of the jurisdictional act is broad and does, we think, intend a disclosure of all sums of money disbursed by the United States for or in behalf of the Indian claimants. The set-off is a legal one and not a gratuity.
The United States has appropriated and disbursed the total sum of $2,488,624.53 for the benefit of the plaintiffs. The question of the adequacy or inadequacy of this sum for the purposes intended is not a judicial one. The special jurisdictional act marks out the limits of the court’s authority, and under our view of the case the petition must be dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Green, Judge, concur.

See final decision, April 8, 1935, on new trial, 81 C. Cls.