Booth, Chief Justice,
delivered the opinion of the court:
The permissive legislation enabling the plaintiff Indians to bring this suit appears in Finding 1. This act not only describes the character of plaintiffs’ suit but gives by metes and bounds a description of the lands alleged to have been occupied and in possession of the plaintiffs and which as *150 alleged were later taken and disposed of by the defendant. The amount claimed in the petition is $6,177,587.50 and interest thereon, reduced in the requested findings to $5,975,-056.25 and interest.
In all essential particulars the gravamen of plaintiffs’ complaint is similar to numerous other cases involving an alleged taking of the original lands occupied by the Indians in their early settlements in the country designated, which were thrown open to settlement and homestead entries by the United States as emigration to the west increased, and territories and States were created and white settlement encouraged.
The special jurisdictional act discloses that the lands described therein are a portion of the lands described in the treaty of 1855 to which the plaintiffs were parties, and this brings us to a discussion of this treaty. The Territory of Oregon was created by the act of August 14, 1848 (9 Stat. 323); about two years later, June 5, 1850 (9 Stat. 436), Congress passed an act authorizing the President to appoint one or more commissioners to negotiate treaties with the Indians within the territory for the extinguishment of their claims to lands lying within the district involved in this case.
On and prior to the above date it was reported that at least sixty-five tribes of Indians resided within the confines of the Territory. Thirty tribes resided North of the Columbia River and the remaining tribes South of the same. Joel Palmer, Superintendent of Indian Affairs in Oregon, was duly authorized to conduct negotiations with the tribes residing in the district where plaintiffs locate their lands.
September 8, 1855, Palmer completed negotiations for a treaty with twenty-five bands of Indians for the cession of a large portion of their lands to the United States. The plaintiffs were parties signatory to this treaty and it appears from the terms of the treaty and the description of the lands ceded that it was a joint cession from confederated bands. This treaty was never ratified, and the plaintiffs now seek to carve out of the cession then contemplated a landed estate to which they assert a common Indian title.
It is most difficult to ascertain the origin of the plaintiff tribes. The reliable sources of information available desig *151 nate them as of the Kusan family, which was “a small linguistic stock occupying villages on the Coos River and Bay and on the lower Coquille River in Oregon.” The Handbook of American Indians, Bureau of Ethnology, vouches for the fact that while originally these bands may have occupied a territory remote from the coast, they were forced therefrom by other tribes, and eventually occupied villages along the coast and tributaries of Coos Bay.
There is no doubt but that the plaintiff Indians established their villages along the coast, and subsisted primarily upon sea food, making infrequent excursions inland to procure beri'ies and other products of the soil. They were decidedly peaceable and friendly Indians. Their bands were small in number, never hostile nor practicing the savage customs of other tribes. It is impossible to establish with any degree of certainty the location of these tribes prior to 1855.
In 1855, as previously stated, we find the plaintiffs with the confederated bands which joined in signing the treaty of November 9,1855, and by an Executive order of that date the so-called Siletz Reservation was established out of the lands ceded by the confederated Indian tribes in the treaty of 1855 as a reservation for these and other Indian tribes.
Shortly after the treaty of 1855 had been signed by the Indians the Rogue River War occurred. This hostility involved the Rogue River and other Indians, and the outbreak was not suppressed until 1856. When this war broke out the Lower Umpquas were placed upon a temporary reservation under the care of a special Indian agent. The Coos were placed upon another temporary reservation and the Siuslaws remained upon land within the Siletz or Coast Reservation.
The location of the plaintiff tribes upon temporary reservations, while somewhat vigorously attacked by plaintiffs, was undoubtedly intended for their good. The Coos and Lower Umpqua Tribes remained upon the temporary reservations until 1860, when they Were transferred to a tract of land on the coast part of the Coast Reservation. At this time numerous small tribes of Indians resided upon this reservation; in fact, all the confederated tribes signatory to *152 the unratified treaty of 1855 were removed thereto except three.
December 21, 1865 (1 Kappler 891), an Executive order was issued and later, on March 3, 1875 (18 Stat. 420, 446), an act passed whereby about three-fourths of the Coast, or Siletz Reservation was thrown open to public settlement and the remaining lands were allotted to the Indians in severalty under the act of February 8, 1887 (24 Stat. 388)., Finally all the unallotted lands of the reservation were ceded to the United States by Article 1 of the agreement of October 31, 1892, ratified by the act of August 15, 1894 (28* Stat. 286, 323). The act of May 31, 1900 (31 Stat. 221, 233),. modified the act of 1894, supra, and all the lands involved,, with, certain exceptions not important, were disposed of by, the United States for the benefit of all the Indians including plaintiffs, under the act of May 13, 1910 (36 Stat. 367), as; amended by the act of May 18,1916 (39 Stat. 123,149). The plaintiffs were parties to the agreement of October 31, 1892.
We have recited the above facts, which appear in detail in the findings, to disclose what the record indisputably establishes, viz, that the United States never recognized the* plaintiff Indians as. the aboriginal owners of the lands they now claim. What the United States did with respect to their existing: status was done under its plenary authority over tribal Indians, their lands and funds. The United States consummated no treaty relationship with them and until the agreement of October 31, 1892 (supra), recognized no existing rights of property to any specific area of lands to be* vested in them.
Plaintiffs rest their.case in the essential particular to sustain it upon the oral testimony of twenty-one witnesses. If this testimony is to prevail in every way over documentary and historical evidence it is sufficient to observe that it does prove by hearsay that plaintiffs did occupy the lands claimed from time immemorial. The oral testimony of numerous. Indian witnesses, some of whom were aged and others, younger, details facts and traditions. In this case, at least, seventeen of the twenty-one witnesses produced have a direct-interest in the outcome of this case.
To establish Indian title to a vast acreage of lands by-oral testimony, irrespective of the obstacles of establishing; *153 it by any other method, exacts a degree of proof sufficient to overcome contemporaneous documentary and historical evidence to the contrary. No doubt exists that the plaintiff Indians originally did reside upon the Coast Reservation with the other tribes thereon; how long they continued this-residence and what particular portion thereof was conced-edly theirs are impossible of ascertainment.
The Executive order of November 9, 1855, a governmental procedure obviously induced by solicitude for the Indians, which established the Coast Reservation, did not segregate a distinct and carefully described portion of all the lands in the reservation to any one tribe or band. This: order comprehended all the lands involved in the unratified treaty of 1855, and dealing with confederated tribes did not preclude any of the individual tribes from their common-interest in the entire reservation.
The plaintiff Indians are admittedly small tribes, and it is conceded they lived in villages adjacent to the waters of the bay or ocean, depending primarily upon fish and sea food for subsistence. Because of their intimate contacts with other tribes, intermarriages have to a large extent obliterated their tribal entity, and it is impossible under the law to ascribe to them other landed interests than the findings-show. Duwamish Indians v. The United States, 79 C. Cls. 530; Conley v. Ballinger, 216 U. S. 84.
An unratified Indian treaty is not evidence of governmental recognition of Indian title to lands described therein. Conley v. Ballinger, supra. Jurisdictional acts merely provide a forum for the presentation and adjudication of Indian cases. United States v. Mille Lac Indians, 229 U. S. 498, 500. The fact that the United States did make treaties with other Indians in this same area falls short of establishing individual title to a described area in an unratified treaty. Blackfeet Indians v. United States, 81 C. Cls. 101.
We think the defendant’s requested findings are correct,, and we have adopted the same as our findings. The petition will be dismissed. It is so ordered.
Whaley, Judge; Williams, Judge', Littleton, Judge; and Green, Judge, concur.