**TUSCARORA INDIAN NATION,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Power Authority of the State of New York, Intervenor.

No. 14475.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 28, 1958.

Decided Nov. 14, 1958.

Order March 24, 1959.

Certiorari Granted June 22, 1959.

See 79 S.Ct. 1435.

Mr. Arthur Lazarus, Jr., Washington, D. C., with whom Mr. Eugene Gressman, Washington, D. C., was on the brief, for petitioner.

Mr. John C. Mason, Deputy General Counsel, Federal Power Commission, with whom Mr. Willard W. Gatchell, General Counsel, Federal Power Commission, and Mr. Joseph B. Hobbs, Attorney, Federal Power Commission, were on the brief, for respondent. Mr. Howard E. Wahrenbrock, Solicitor, Federal Power Commission, also entered an appearance for respondent.

Mr. Thomas F. Moore, Jr., New York City, with whom Mr. Frederic P. Lee,

Washington, D. C., was on the brief, for intervenor.

Before PRETTYMAN, Chief Judge, and EDGERTON and DANAHER, Circuit Judges.

PRETTYMAN, Chief Judge.

The issue here is whether the New York Power Authority has a valid license from the Federal Power Commission to build a dam that will flood certain lands of the Tuscarora Indians. We are of opinion that the case must be remanded to the Federal Power Commission for further consideration. In order that the litigation may not be delayed more than is necessary, we shall state in this memorandum the propositions which lead to our conclusion, without taking the time to complete an opinion in the customary form.

### I

■ The relationship of the United States to the Tuscarora Indians resembles a guardianship, and control over the alienation of their lands is in the United States. A long-existing statute [1] provides: "No purchase, grant, lease, or other conveyance of lands * * * from *any* Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." (Emphasis added.) The point is further made specific in regard to lands within Indian reservations in the State of New York by a statute adopted by the Congress in 1950,[2] which

1. Rev.Stat. § 2116 (1875), 25 U.S.C.A. § 177.

2. 64 Stat. 845, 25 U.S.C.A. § 233.

3. Tuscarora Nation of Indians v. Power Authority, 2 Cir., 1958, 257 F.2d 885.

4. See United States v. 7,405.3 Acres of Land, 4 Cir., 1938, 97 F.2d 417; Cohen, Federal Indian Law 321 (4th ed. 1945); 18 Ops. Atty. Gen. 235 (1885). And also see United States v. Candelaria, 1926, 271 U.S. 432, 46 S.Ct. 561, 70 L. Ed. 1023; United States v. Sandoval, 1913, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107.

5. The Commission knew in January of the opposition of the Tuscaroras. The

conferred upon the courts of New York jurisdiction of certain actions involving Indians but contained the proviso "That nothing herein contained shall be construed as authorizing the alienation from any Indian nation, tribe, or band of Indians of any lands within any Indian reservation in the State of New York". The United States Court of Appeals for the Second Circuit held that the lands involved here are protected by that provision.[3] It makes no difference how title to the land may have been acquired by the tribe.[4]

The statement in the letter of the Assistant Secretary of the Interior, referred to in the Commission's order denying rehearing, that these reservation lands are under state jurisdiction, is patently in error in so far as alienation is concerned.

To validate the taking of these lands by the Power Authority of New York for reservoir purposes, the consent of the United States must be found in some manner.

### II

■ We have jurisdiction. The Federal Power Commission issued the license for this project (Project No. 2216, Niagara Project) by an order dated January 30, 1958. It did not in that order designate the land upon which the reservoir here involved should be located.[5] In an order dated May 5, 1958, the Commission approved for inclusion in the license a map showing the location of the

January 30th order recited: "The Tuscarora Indian Nation objects to the use of approximately 1,000 acres of its land for reservoir purposes. The stated reason for its objection is that it wants to remain undisturbed in possession of the land. The lands of the Indian Nation are almost entirely undeveloped except for agricultural use. The Indian Nation states that it will not sell its lands and contends that the Applicant lacks authority to acquire them. However, we do not attempt to pass on that question since other lands are available for reservoir use if the Applicant is unable to acquire the Indian lands, although alternative lands may be more expensive."

project works authorized by the license. The Tuscarora Nation petitioned for review of the January order. It did not separately or specifically petition for review of the May order. The Power Authority argues that the only order as to which the Tuscaroras are aggrieved is the May order and that we have no jurisdiction over that order because no appeal was taken from it. We treat the May order as the Commission treated it, i.e., that the map which it approved became a part of the license for the project, which license was issued by the January order. As a matter of fact, some time prior to April 18, 1958, the State of New York, on behalf of the Power Authority, for purposes of condemnation filed with the County Court of Niagara County a map and a description of the project as to which it claimed to be a licensee of the Federal Power Commission, and that map included these Tuscarora lands. The January order of the Commission and all its parts are before us on this petition for review.

### III

■ The Commission was expressly directed by the Congress to issue a license to the Power Authority of New York for the construction of a power project with capacity to utilize all of the United States share of the water of the Niagara River.[6] That statute provided, *inter alia:* "The Federal Power Commission shall include among the licensing conditions, *in addition to those deemed necessary and required under the terms of the Federal Power Act,* the following: [describing seven conditions.]" (Emphasis supplied.) Thus the special statute required the Commission to include in the license all those conditions required by the Federal Power Act. The statute (Sec. 2, 16 U.S.C.A. § 836a) also required that the rules of practice and procedure of the Commission should apply to the granting of the license.

Moreover the record is quite clear that Congress was not advised of the possibility that Indian reservation lands might be sought as the site of part of the project.[7] The Committee reports make no mention of the location of the project works, except, of course, that they would be in this area. During the hearings in 1956, on bills relating to the Niagara power project, witnesses represented to the House Committee that the lands to be acquired for the project belonged to the Niagara Mohawk Power Company. Senator Chavez, Chairman of the Committee in charge of the bill, told the Senate: "No dams or provisions for storage of water are necessary."[8] This testimony related to the project as planned prior to the Schoellkopf disaster, but we are not advised that the impression given was ever withdrawn or changed.

Congress did not by the special statute of 1957 license the Power Authority for this project. It directed the Commission to issue the license. It did not specify the works (dams, reservoirs, etc.) of which the project was to consist or the property upon which the project works were to be located. It left all those matters to the Commission. It did not specify all the licensing conditions; it specified some and left the others to the Commission. It contemplated, and explicitly said, that there would be a proceeding before the Commission in the process of granting the license. We think Congress clearly meant that the license should be issued under the Federal Power Act and according to the terms of that Act; save only that Congress itself named the licensee, described the scope of the license, and specified seven conditions to be included in the license by the issuing Commission.

As a matter of fact the Federal Power Commission did not understand when it issued its license order of January 30, 1958, that the taking of these reservation

6. Act of Aug. 21, 1957, 71 Stat. 401, 16 U.S.C.A. § 836.

7. 103 Cong.Rec. 13194–211, 13364–5, 14437–56 (1957); H.R.Rep. No. 862,

85th Cong., 1st Sess. (1957); S.Rep. No. 539, 85th Cong., 1st Sess. (1957).

8. 103 Cong.Rec. 14438 (1957).

lands was necessary for the project or that it was authorizing the taking of such lands. In its order the Commission referred to the objection of the Tuscaroras to the use of their land for reservoir purposes and said: "However, we do not attempt to pass on that question since other lands are available for reservoir use if the Applicant is unable to acquire the Indian lands, although alternative lands may be more expensive."

We conclude on this point that Congress did not in the special statute consent to or authorize the taking of this Indian land for this project.

We have given careful consideration to the possibility that Congress, in adopting the 1957 legislation, was exercising for the United States the totality of its sovereign capacity in respect to this resource, and that the exercise of this power by Congress might be said to be without limitations. This might be in furtherance of a policy of Congress so to govern disposal of rights to develop hydroelectric power that the development would be in the manner the Congress, not an administrative agency or the courts, might select.[9] Accordingly it might be argued that Congress in the 1957 Act made provision, by a single stroke, for the immediate development by the Power Authority of one of the nation's greatest resources, with all the concomitant factors of necessary works, seizure of property, and conditions of operation. Of course, had the Federal Government chosen to develop the power through its own plant, it could have done so without the slightest reference to the Power Authority. And, it may be argued, it did precisely that and the Authority is an agent of the United States as well as of the State of New York. Under that view there need be no reference to Part I of the Federal Power Act and hence none to Section 4(e), much less to Section 3(2). Part I of that Act,

in short, might be said to have applicability only in the event that an application by an entity essentially private in origin was made for a license in accordance with the terms of the Act. If Congress, on the other hand, wished to speak directly in the premises—and in behalf of the United States,—it was free to do so in complete disregard of limitations to be found in the Act which would apply in the case of others. Such a course, had Congress adopted it, would have the advantage of short-circuiting restrictions and conditions to be found in the Power Act, to the end that the Power Authority might immediately get on with the business.

We have considered that approach, but even as we have considered it we must reject it, for we find no escape from the language of the 1957 Act. As we have already pointed out, Congress did not issue a license; it authorized and directed its established agency to issue the license, and the Commission was ordered to include not only specified conditions but also "those * * * required under the terms of the Federal Power Act". Inevitably, therefore, we are bound to revert to the Commission's January order and its order denying the Tuscarora petition for rehearing, pursuant to which the license was to issue. Accordingly we turn specifically to consideration of the controlling aspect of the question before us, namely, whether or not the license might be issued without a Section 4(e) finding. The answer to that question depends in turn upon the meaning of Section 3(2).

### IV

▮ The Federal Power Act defines certain words for the purposes of the Act. It provides:[10]

"'[R]eservations' means national forests, *tribal lands embraced within Indian reservations*, military res-

---

9. See United States v. San Francisco, 1940, 310 U.S. 16, 29–30, 60 S.Ct. 749, 84 L.Ed. 1050; compare Federal Power Commission v. Niagara Mohawk Pow-

er Corp., 1954, 347 U.S. 239, 250, 74 S. Ct. 487, 98 L.Ed. 686.

10. Sec. 3(2), 41 Stat. 1063 (1920), as amended, 49 Stat. 838 (1935), 16 U.S. C.A. § 796(2).

ervations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purposes; but shall not include national monuments or national parks". (Emphasis supplied.)

It further provides[11] in pertinent part that "The Commission is * * * empowered * * * [t]o issue licenses * * * for the purpose of constructing * * * reservoirs * * * upon * * * reservations of the United States". Then follows a proviso:

"*Provided*, That licenses shall be issued *within any reservation only after a finding* by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation". (Emphasis ours.)

The land here in dispute is indubitably "tribal lands embraced within Indian reservations" within the usual meaning of that phrase. But it is argued by the Commission and the Power Authority that the term "reservations" as used in this statute does not include all tribal lands embraced within Indian reservations but only those tribal lands in which the United States owns an interest and which have been withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws. The

argument is based upon a construction of the definition in Section 3(2) of the Act. That construction would be that the phrase "owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws" describes all the opening terms in the paragraph— i.e., national forests, tribal lands embraced within Indian reservations, and military reservations. The Commission and the Power Authority say that the United States has and has had no interest in these lands. They point to the fact that this land was acquired by the Tuscaroras by purchase in fee simple with money obtained by them from the sale of land in North Carolina. We think that this reservation is one in which the United States has an interest, and the result here reached must be the same as if the phrase "owned by the United States, [etc.]" were not construed as a limitation upon the term "tribal lands [etc.]" The money derived from the sale in North Carolina was handled by the United States on behalf of the Indians and was applied by the United States to the acquisition of this land, which adjoined the reservation already owned and occupied by the tribe. We are not alone in concluding that the Tuscaroras' reservation clearly is entitled to the protections accorded without distinction to Indian tribal lands elsewhere. In United States v. 7,405.3 Acres of Land [12] Judge Parker laid down the doctrine that the guardianship of the United States over the Indians, which includes protection of the Indians from improper alienation of their lands, constitutes sufficient interest in those lands to require congressional expression of the consent of the United States to such alienation. We concur in that view.[13] Whether un-

---

11. Sec. 4(e), 41 Stat. 1065 (1920), as amended, 49 Stat. 840 (1935), 16 U.S. C.A. § 797(e).

12. 4 Cir., 1938, 97 F.2d 417.

13. We need not go into the complicated ramifications of the nature of Indian reservations depending upon the process of their creation. See, e. g., United

States v. Alcea Band of Tillamooks, 1946, 329 U.S. 40, 67 S.Ct. 167, 91 L. Ed. 29; Sioux Tribe v. United States, 1942, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501; Hynes v. Grimes Packing Co., 1949, 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231; Tee-Hit-Ton Indians v. United States, 1955, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314.

der the Constitution's "Property" clause, obviously applicable to Government lands, concededly within Section 4(e) of the Act, or under the "Commerce" clause, predicating Section 21 of the Act,[14] the proviso in Section 4(e) requires a Commission finding with respect to the lands in question here.

The argument of the Federal Power Commission and the Power Authority is that the Power Act allows the Commission to deal with federal land (except national forests and monuments) after a Section 4(e) finding. In that section Congress was exercising its constitutional right to dispose of property held by the United States. By Section 21 of the Act, says the Commission, Congress, acting under the interstate and foreign commerce clause, allowed the Commission to act in regard to non-federal land. Generally speaking, we agree with the Commission up to this point.

But the application of Section 21 to land held in fee simple by Indian tribes presents a special problem, even if such land be deemed to be non-federal land. Dealings with the Indians are within a special clause of the Constitution, conferring power on the Congress to regulate commerce with the Indian tribes. The relationship between the United States and members of Indian tribes resembles that of guardian and ward. Alienation of Indian lands, a prerogative of the United States as guardian, requires congressional consent. We do not find congressional consent in the 1957 statute or in any other statute except the Federal Power Act. We do find that, in allowing the Commission under Section 4(e) of the Federal Power Act to deal with "public lands and reservations" as defined in Section 3(2), Congress was exercising not only its power under the property clause of the Constitution but also its power to regulate commerce with

the Indian tribes and, therefore, to allow alienation of the land here involved.

## V

On the record before us it does not appear that the acquisition of the Tuscarora land is a matter of necessity to the construction of the project to the full extent of its planned scope. The acquisition is desirable solely from the standpoint of economy; apparently acquisition and construction costs would be lower here than at any other place in the area. We fail to find anywhere an inclination of the Congress to save costs to its sole licensee for this enormous power project at the expense of Indians living on an Indian reservation.

## VI

■ We have authority to remand to the Commission for further findings.[15]

## VII

We are of opinion that the Commission cannot issue a license for the purpose of constructing a reservoir on these tribal lands embraced within the Tuscarora reservation, unless it can make the finding required by the proviso in Section 4 (e) of the Federal Power Act. We will remand the case to the Commission that it may explore the possibility of making that finding. If the Commission concludes that the finding can be made and makes it, or proposes to make it, it will amend its January 30th order to include that finding. We retain jurisdiction of the cause pending receipt from the Commission of notice of its action pursuant to this remand. In order that the litigation may not be prolonged unduly, our remand order will require that the Commission report to us within fifteen days hereafter regarding its action pursuant to the remand.

So ordered.

---

14. 41 Stat. 1074 (1920), 16 U.S.C.A. § 814.

15. Ford Motor Co. v. Labor Board, 1939, 305 U.S. 364, 59 S.Ct. 301, 83 L.Ed. 221;

Fleming v. Federal Communications Comm., D.C.Cir.,1955, 96 U.S.App.D.C. 223, 225 F.2d 523.

**344**

Before PRETTYMAN, Chief Judge, and EDGERTON and DANAHER, Circuit Judges, in Chambers.

ORDER

PER CURIAM.

Whereas we held in our opinion filed herein November 14, 1958, that the finding required by Section 4(e) of the Federal Power Act, 16 U.S.C.A. § 797(e), is necessary to the validity of a license purporting to authorize the condemnation of Tuscarora Indian tribal lands, and remanded this case to the Federal Power Commission for further proceedings;

And Whereas on February 2, 1959, after extensive hearings, the Commission, in an opinion and finding, reported to this court that under the facts presented it could not make the finding required;

And Whereas the petitioner subsequently moved for final determination of issues, the respondent moved for reconsideration and for final determination of issues, the intervenor moved for renewal of its petition for reconsideration of interlocutory holdings, and the United States, having been admitted as *amicus curiae*, moved for reconsideration and for oral argument, and the court having duly considered the foregoing motions and report of the Commission;

Now, therefore, it is ordered by the court that the license issued by the Commission to the Power Authority of the State of New York for the Niagara River Project is approved except in so far as it would authorize the condemnation of Tuscarora Indian tribal lands for reservoir purposes, and further ordered that this case be remanded to the Commission with instructions to amend its licensing order so as to exclude specifically the power of the said Power Authority to condemn the said lands of the Tuscarora Indians for reservoir purposes.